UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>HEDGELENDER LLC,<br>DANIEL W. STAFFORD, and<br>FRED R. WAHLER, JR.,<br><br>    Defendants. | :<br>:<br>:<br>:<br>:<br>: Case No: 2:09-cv-859<br>:<br>:<br>:<br>:<br>:<br>: |

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission (the "SEC" or "Commission") alleges the following:

### INTRODUCTION

1. From February 2006 through at least November 2007, HedgeLender LLC ("HedgeLender") and its two principals, Daniel W. Stafford ("Stafford") and Fred R. Wahler, Jr. ("Wahler") made material misrepresentations to clients in connection with a fraudulent stock-based loan scheme operated by Michael Spillan and Melissa Spillan ("the Spillans") through One Equity Corporation and its affiliates ("One Equity" or the "One Equity Companies").

2. HedgeLender holds itself out as a stock-based loan broker. In February 2006, it entered into an agreement with the One Equity Companies through which HedgeLender referred borrowers to One Equity in exchange for commissions on successful stock-based loan transactions. From February 2006 through at least November 2007, HedgeLender referred approximately 54 borrowers to One Equity and received approximately $1.7 million in

commission payments. Stafford and Wahler personally received shares of the commission payments.

3. On its website, drafted by Stafford and reviewed by Wahler, HedgeLender promoted various stock-based loan programs, including the Star HedgeLoan®. One Equity funded and administered the Star HedgeLoan®. HedgeLender and its principals represented to potential clients that it had certified its stock-based loan programs, vetted the professional reputations of those that administered the programs, and ensured the security of borrowers' shares. In reality, Stafford and Wahler conducted minimal due diligence and failed to investigate "red flags" that cast doubt on One Equity's ability to administer and fund its stock-based loans.

4. The One Equity Companies were not legitimate lenders. One Equity and the Spillans induced borrowers to transfer ownership of publicly traded stock to them as collateral for purported non-recourse loans. They represented that all shares would be returned to borrowers upon repayment of the loans. However, the Spillans generally liquidated the shares to fund the loans and failed to maintain adequate cash reserves necessary to repurchase and return the shares to borrowers. They misappropriated sales proceeds to pay their expenses, including over $1 million in salaries and other benefits.

5. HedgeLender and its principals misrepresented to clients and potential borrowers the legitimacy and integrity of the Star HedgeLoan® and the amount of due diligence that they had conducted. Adequate due diligence would have revealed that One Equity and the Spillans had no funding source and had never run a legitimate stock-based lending enterprise. Despite red flags, Stafford and Wahler continued to refer customers without changing their website representations or otherwise warning customers.

6. Through its misrepresentations, HedgeLender, Stafford, and Wahler, directly or indirectly, have engaged in, and, unless restrained and enjoined by this Court, will continue to engage in, transactions, acts, practices, and courses of business, which violate Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§77q(a)(1), 77q(a)(2), and 77q(a)(3)].

7. HedgeLender, Stafford, and Wahler, directly or indirectly, also have engaged in, and, unless restrained and enjoined by this Court, will continue to engage in, transactions, acts, practices, and courses of business, which violate Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] thereunder.

8. The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§77t(b) and 77t(d)] and Sections 21(d)(1), 21(d)(3), and 21(e) of the Exchange Act [15 U.S.C. §§78u(d)(1), 78u(d)(3), and 78u(e)] for an order permanently restraining and enjoining the defendants, requiring disgorgement and prejudgment interest from the defendants, and imposing civil penalties on the defendants.

## JURISDICTION

9. This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v] and Section 27 of Exchange Act [15 U.S.C. §78aa].

## DEFENDANTS

10. HedgeLender LLC is a Pennsylvania limited liability company with its principal place of business in Philadelphia, Pennsylvania.

11. Daniel W. Stafford is 55 years old and is a resident of Gaithersburg, Maryland. He is the founder, president, and co-owner of HedgeLender.

12.    Fred R. Wahler, Jr. is 41 years old and is a resident of Philadelphia, Pennsylvania. He is vice president and co-owner of HedgeLender.

## RELATED ENTITIES

13.    The One Equity Companies include One Equity Corporation (Delaware corporation), Triangle Equities Group (Delaware corporation), Dafcan Finance, Inc. (Delaware corporation), and Victory Management Group, Inc. (Nevada corporation), all with their principal place of business in Westerville, Ohio. Michael Spillan and his wife, Melissa Spillan, controlled the One Equity Companies. Michael S. Spillan is a convicted felon, with a long record of financial crimes. They consented to the entry of permanent injunctions in a related fraud action. SEC v. One Equity Corp., 2:08-CV-667 (S.D. Ohio).

## FACTS

**The Fraudulent Stock-Based Loan Scheme**

14.    From about 2004 to July 2008, Michael Spillan and Melissa Spillan, through the One Equity Companies, ran a fraudulent stock-based loan program. The One Equity Companies held themselves out as stock-based lenders. They offered to loan money to borrowers in exchange for receipt of stock as collateral. The One Equity Companies represented to borrowers that their stock was safe and would be returned to them upon repayment of the loans. They obtained borrowers from stock-based loan brokers, such as HedgeLender, and other sources.

15.    The One Equity Companies were not legitimate lenders. They did not have a funding source, and unbeknownst to borrowers, the Spillans generally liquidated borrowers' shares in order to fund the loans. They also failed to maintain adequate cash reserves necessary to repurchase and return the shares to borrowers upon repayment of their loan obligations.

4

16. The Spillans raised about $70 million from approximately 125 borrowers and misappropriated the sales proceeds to pay their expenses, including over $1 million in salaries and other benefits. From February 2006 through at least September 2007, they also used sales proceeds to pay approximately $1.7 million in commissions to HedgeLender. Stafford and Wahler received shares of these commission payments.

**HedgeLender's Relationship with the One Equity Companies**

17. In early 2006, Dave Gullickson, an independent contractor who previously worked with Stafford, introduced HedgeLender to the One Equity Companies. Gullickson explained that the One Equity Companies offered a prepayable stock-based loan product (i.e., it could be paid before maturity and borrowers could reclaim their pledged shares). After speaking with Gullickson, Stafford had one phone conversation and exchanged e-mails with Melissa Spillan, a principal of the One Equity Companies. Stafford also received an anonymous letter stating that Michael Spillan was a convicted felon who had a history of improperly selling shares pledged by borrowers. The letter specifically cautioned HedgeLender against entering into a business relationship with One Equity and Michael Spillan.

18. On February 16, 2006, without conducting sufficient due diligence, HedgeLender entered into an agreement with the One Equity Companies under which HedgeLender would refer borrowers to One Equity and receive commissions in exchange for its services. In response to the anonymous letter, Stafford included a termination option in the agreement that gave HedgeLender the right to cancel the contract if Michael Spillan became involved with the One Equity Companies.

**HedgeLender's Representations**

19. HedgeLender held itself out as "the top-rated U.S. specialist in non-recourse hedged stock portfolio loans" for over a decade. It told borrowers that its name was "synonymous with dependability for thousands of stock owners." HedgeLender represented that it was "the only hedged portfolio stock loan firm with a perfect rating by the Better Business Bureau." HedgeLender represented that it offered "the broadest range of legitimate non-recourse stock-collateralized finance in the market today." Examples of HedgeLender's website representations are attached hereto as Exhibits A and B.

20. HedgeLender marketed the Star HedgeLoan® to potential borrowers on its website and through its affiliates. HedgeLender made a number of representations to clients and potential borrowers about its stock-based loan programs.

21. First, HedgeLender certified that the Star HedgeLoan® met "the most rigorous standards of security and compliance in the industry." It qualified the Star HedgeLoan® under its HedgeLoan® certification program, which HedgeLender touted as a "'best of breed' evaluation standard for four superior loan structures that have met our rigorous requirements for regulatory compliance, borrower value, and asset security." HedgeLender represented that HedgeLoan® certification was "reserved only for those loan structures that have been built from the ground up with strict adherence to regulatory and legal compliance as a first priority."

22. In certifying the Star HedgeLoan®, HedgeLender represented that the loan program provided the following:

    (a)    Top-tier, transparent, U.S.-based credit and account facilities;

    (b)    Regulation-compliant structures;

    (c)    Comprehensive account statements;

6

  (d)  Responsive 24-hour service; and

  (e)  Direct asset management by [vetted] licensed individuals or organizations with outstanding [verified] reputations for execution and performance extending at least 15 years.

23.  Second, HedgeLender represented that there would be "full protection" for shares pledged as collateral for HedgeLoans®. It warranted that "[f]ull share security is assured from start to finish for every loan, from the smallest to the largest." HedgeLender minimized the risks that borrowers would face in pledging shares as collateral for the stock-based loans:

> Security and compliance are the basic building blocks of our company. HedgeLender's HedgeLoan label is in essence a form of "certification" that says your hedged portfolio funding structure meets the highest standards for security, compliance, liquidity, and personal service in the industry possible. In practical terms, we feel safe in saying that your shares are as safe as any investment with HedgeLender.

24.  HedgeLender specifically represented that all shares pledged as collateral for HedgeLoans "[had] been secured and immediately returned for *every* repaid HedgeLender loan since [its] inception." HedgeLender also represented that borrowers would receive quarterly account statements so that they could monitor the performance of their shares versus their loan obligation.

25.  In addition to its representations, HedgeLender included a "primer" on its website instructing borrowers how to recognize "fraud and abuse in the private placement stock based loan industry."

26.  Among other things, HedgeLender advised clients to heed warning signs:

  (a)  "If you don't see biographical information on the principals of a financial firm that is asking to hold your precious collateral, something is amiss."

  (b)  "Look for defaulter lender 'Flags' in your loan contract."

(c) "You should care about your stocks and how they are secured. Suspect lenders never hedge – or otherwise secure your shares. Rather, they seek to have you default so that they will never have to return your shares."

(d) "They seek to get you to let them legally have your stock via the contract and they then sell it outright in one lump sell-off to obtain the cash for your "loan." They offer a low "loan-to-value" – for example, 70% -- and pocket the difference – e.g., 30% - for themselves. There is no security, no way to get the stocks back, no hedge against risk, nothing to ensure that your shares will be returned on time upon repayment of your loan."

(e) "No information on website about principals."

(f) "No membership in Better Business Bureau or similar organizations which welcome complaints and make these records available to the public (as HedgeLender does)."

(g) Post loan signals, such as large increases in volume of trading before you obtain your cash and significant drops in share price prior to receipt of your loan cash.

**HedgeLender Conducted Almost No Due Diligence**

27. Contrary to its website representations, HedgeLender and its principals did not conduct extensive due diligence on One Equity, its agents, and the Star HedgeLoan®. They merely relied on representations from Melissa Spillan and Dave Gullickson and conducted various Internet searches. That due diligence was deficient. For example:

(a) They failed to determine whether One Equity had a funding source or adequate capital reserves;

(b) They failed to verify whether One Equity had stock-based loan experience and a workable lending model; and

(c) They failed to vet the professional reputations of One Equity's agents.

28. Adequate due diligence would have revealed that One Equity never had a funding source, credit lines, a relationship with a pension fund or bank, or capital reserves. It would have revealed that One Equity funded loans by dumping shares. It would have revealed that One

Equity's agents did not have lending experience and that One Equity had never run a legitimate stock-based lending operation and did not have a viable hedging strategy or lending model.

***HedgeLender failed to determine whether One Equity had a funding source or adequate capital reserves***

29.     HedgeLender and its principals qualified the Star HedgeLoan® without verifying with third parties whether the One Equity Companies had a funding source, adequate capital reserves, credit lines, or a relationship with a bank.

30.     Stafford and Wahler accepted representations by Melissa Spillan or others as evidence that One Equity had a funding source and maintained adequate capital reserves. One such representation was that a North Carolina pension fund provided the funding for One Equity's stock-based loans. Stafford and Wahler did not independently corroborate any such representations:

> (a) Stafford and Wahler never contacted any bank with which One Equity purportedly had a relationship, and they never obtained bank statements from One Equity;
>
> (b) Stafford and Wahler never contacted the financial institutions with which One Equity purportedly had credit lines or capital reserve accounts, and they never obtained from One Equity contact information for or account statements from those financial institutions; and
>
> (c) Stafford and Wahler never contacted the North Carolina fund or the director who purportedly signed a letter to Melissa Spillan. They also never inspected credit letters or bonding arrangements between One Equity and the fund.

***HedgeLender failed to verify whether One Equity had stock-based loan experience and a workable lending model***

31.     Melissa Spillan represented that One Equity had closed many transactions. She also stated that One Equity would sell less than 5% of shares as "test trades," but would not

dump shares to fund loans. She explained that One Equity hedged its risk through its loan discount and interest payments. Stafford and Wahler accepted these representations.

32. Before entering into the agreement, HedgeLender and its principals did not verify independently that One Equity had successfully serviced stock-based loans and had a legitimate hedging strategy. For example:

- (a) Stafford and Wahler did not obtain loan references from One Equity or contact previous borrowers to ascertain whether One Equity had ever successfully serviced a loan to term;

- (b) Stafford and Wahler did not examine loan documents or lending agreements between One Equity and previous borrowers; and

- (c) Stafford and Wahler did not review brokerage account statements to determine whether One Equity ever dumped shares to fund the loans;

- (d) Stafford and Wahler did not take adequate steps to ascertain whether One Equity ever failed to fund loans or return shares to borrowers.

*HedgeLender failed to vet the professional reputations of One Equity's agents*

33. HedgeLender conducted basic Internet searches to assess the professional experience of One Equity's employees, but that due diligence was not adequate. For example:

- (a) Stafford and Wahler did not ascertain whether any One Equity employee had professional experience with stock-based loans;

- (b) Stafford and Wahler did not determine whether any One Equity employee had a college degree; and

- (c) Stafford and Wahler did not investigate whether any One Equity employee had a professional license.

**HedgeLender Disregarded Red Flags About One Equity's Ability to Fund Its Loans**

34. HedgeLender failed to respond adequately to information casting doubt on One Equity's ability to manage and fund its stock-based loans.

35. HedgeLender and its principals received specific complaints from its customers that put them on notice that One Equity was not running its stock-based loan business as represented. For example:

> (a) Borrowers complained that One Equity and the Spillans were non-responsive to their inquiries and ignored requests for documents;
>
> (b) Borrowers complained about loan reductions, delayed funding, or failures to return shares; and
>
> (c) Borrowers eventually complained about failures to fund loans.

36. In addition to client complaints, Stafford and Wahler knew that Michael Spillan had been released from prison and was active in One Equity's operations by at least March 2007. Stafford and Wahler knew that Michael Spillan was a convicted felon and had been warned that he had a history of improperly selling shares pledged by borrowers.

37. In face of these warning signs, HedgeLender and its principals took no steps to terminate its relationship with One Equity, or at a minimum, to advise clients that there were significant risks with the Star HedgeLoan®.

*Complaints about incorrect documents and non-responsiveness*

38. Although HedgeLender represented to borrowers that they would receive "quarterly account statements to monitor the performance of [their] asset versus [their] obligation," clients complained to HedgeLender about not receiving or receiving incorrect invoices and quarterly statements from One Equity. Stafford and Wahler never inspected client invoices and quarterly statements generated by One Equity. HedgeLender requested permission

11

to review invoices and loan statements, but One Equity denied its requests. Rather than demand compliance, HedgeLender dropped the issue.

39.     Stafford and Wahler took insufficient steps to ensure that One Equity provided "responsive 24-hour service" as represented on its website. Borrowers complained that One Equity and the Spillans were non-responsive to their inquiries. Stafford and Wahler raised the issue with One Equity, but the problems only worsened after Michael Spillan began running One Equity.

### *Complaints about funding issues and return of shares*

40.     Stafford and Wahler received complaints that One Equity reduced loan amounts, delayed funding, and failed to return shares.

41.     For example, in January 2007, Client C entered into a stock-based loan with One Equity through HedgeLender. Client C pledged 3,333 shares of CBOT Holdings (NYSE trading symbol BOT), which had a market value of $576,609, or $173 per share. A few months later, the BOT shares significantly appreciated in value, and Client C told One Equity that he wanted to repay his loan and reacquire his collateral.

42.     One Equity told Client C that his shares were frozen in an E*TRADE account, and that he would not be able to reacquire the shares. Stafford and Wahler did not speak with anyone from E*TRADE. Rather, Stafford and Wahler accepted One Equity's representations without sufficient investigation. Client C ultimately obtained additional loan proceeds from One Equity.

43.     In June 2007, Client L entered into a stock-based loan with One Equity through HedgeLender. In early July, Client L transferred to One Equity 155,000 shares of Halozyme Therapeutic, Inc. (Nasdaq trading symbol HALO), which had an approximate market value of

$1,550,000, or $10/share. Client L was told he would fund the loan at 80% loan-to-market value, and several weeks later he received approximately $500,000, which was $744,000 less than the agreed loan amount.

44.  Client L complained to HedgeLender that One Equity had not funded the loan in full. Stafford told Client L that administrative problems with One Equity's pension fund were responsible for the delay. In reality, One Equity had dumped the shares and used the proceeds to pay off its obligation to other borrowers. Client L's loan was never funded in its entirety.

45.  Stafford and Wahler took steps to redress these complaints. In some instances, they exacted concessions, such as interest rate reductions and credit line increases, for their clients, and they continued to refer clients to One Equity.

46.  On August 2, 2007, Client A entered into a stock-based loan with One Equity through HedgeLender. Client A pledged 1,254,800 shares of NaviSite, Inc. (Nasdaq trading symbol NAVI), which had a current market value of $10,289,360, or $8.20 per share. On September 4, 2007, agreed to fund the loan at 80%, for a net loan amount of $7,779,760. The letter stated that the stock value was $9,724,700, or $7.75 per share, $550,000 less than market value at the time of delivery. Three weeks later, One Equity further reduced the loan amount to $6,500,000.

47.  Client A complained to HedgeLender about the funding delays and suspected that that One Equity was dumping shares. Wahler and Roel Hoekstra, a HedgeLender affiliate, called Michael Spillan, who claimed that administrative problems at its pension fund were responsible for the delays. They did not ask to see brokerage statements or speak to someone at the pension fund. Rather, Stafford and Wahler accepted One Equity's representations without further investigation.

48.     Hoekstra told Stafford and Wahler that reduction in loan amounts and funding delays were "red flags" that cast doubt on One Equity's ability to administer and fund the loans. He urged them to visit One Equity and investigate the problems with Client A's loan. Stafford declined and said, "[t]he only thing Mike [Spillan] will do is sweet talk me and tell me everything is fine." Hoekstra visited One Equity and was satisfied with his visit. Client A's loan was eventually funded in pieces.

### *HedgeLender Conducted Business with Michael Spillan*

49.     Stafford and Wahler learned that Michael Spillan had been released from prison and was involved in operating One Equity by at least March 2007. At that time, Melissa Spillan told Stafford and Wahler to address certain funding issues with Michael Spillan.

50.     Stafford and Wahler chose not to terminate the relationship with One Equity or warn clients and potential borrowers that a convicted felon with a history of financial crimes was involved in the company that managed their stock-based loans.

## COUNT I

### Defendants Violated Section 17(a)(1) of the Securities Act [15 U.S.C. §77q(a)(1)]

51.     Plaintiff repeats and realleges paragraphs 1 through 50 above.

52.     Defendants HedgeLender, Stafford, and Wahler engaged in the conduct alleged herein knowingly or with reckless disregard of the truth.

53.     As a result of the activities described above, defendants HedgeLender, Stafford, and Wahler, in connection with the offer or sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have employed devices, schemes, and artifices to defraud.

54. In the offer or sale of securities and as part of the scheme to defraud, defendants knowingly or recklessly made false and misleading statements of material fact and omitted to state material facts to its clients and prospective clients as more fully described above.

55. By reason of the foregoing, defendants violated Section 17(a)(1) of the Securities Act [15 U.S.C. §77q(a)(1)].

## COUNT II

### Defendants Violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§77q(a)(2) and 77q(a)(3)]

56. Plaintiff repeats and realleges paragraphs 1 through 50 above.

57. As described above, defendants HedgeLender, Stafford, and Wahler, in connection with the offer or sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (a) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (b) engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

58. Defendants HedgeLender, Stafford, and Wahler made untrue statements and omissions of material fact and engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

59. By reason of the foregoing, defendants HedgeLender, Stafford, and Wahler violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III

**Defendants Violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5]**

60. Plaintiff repeats and realleges paragraphs 1 through 50 above.

61. Defendants HedgeLender, Stafford, and Wahler engaged in the conduct alleged herein knowingly or with reckless disregard of the truth.

62. As a result of the activities described above, defendants HedgeLender, Stafford, and Wahler, in connection with the purchase or sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities.

63. Defendants HedgeLender, Stafford, and Wahler intentionally or recklessly made the untrue statements and omissions and engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

64. By reason of the foregoing, defendants violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that this Court:

A. Find that defendants HedgeLender, Stafford, and Wahler committed the violations alleged above;

B.  Enter an Order of Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, restraining and enjoining defendants HedgeLender, Stafford, and Wahler from future violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5 thereunder;

C.  Enter an Order, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], requiring HedgeLender, Stafford, and Wahler to pay civil penalties; and

D.  Enter an order requiring HedgeLender, Stafford, and Wahler to disgorge all ill-gotten gains resulting from their participation in the conduct described above, including pre-judgment interest.

E.  Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

F.  Grant such other and additional relief as this Court deems just and proper.

Dated: September 30, 2009

Respectfully submitted,

*Adolph J. Dean Jr.*

Adolph J. Dean, Jr.
Thomas J. Meier
Frank D. Goldman
Attorneys for Plaintiff
U.S. SECURITIES & EXCHANGE COMMISSION
175 West Jackson Blvd., Suite 900
Chicago, IL 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398
E-mail: DeanA@sec.gov
E-mail: MeierT@sec.gov
E-mail: GoldmanF@sec.gov


LOCAL COUNSEL
s/ with consent of Mark T. D'Alessandro
Mark T. D'Alessandro
Ohio Bar No. 0019877
Assistant United States Attorney
303 Marconi Blvd., 2nd Floor
Columbus, Ohio 43215
Telephone: (614) 469-5715
Facsimile: (614) 469-5653
Mark.dalessandro@usdoj.gov